# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TOYA LYN P., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No. 19 C 1596 |
| v. | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| ANDREW M. SAUL, Commissioner | ) | |
| of Social Security, [1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Toya Lyn P.,[3] applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") in December 2015, alleging a disability onset date of November 11, 2015, when she was 36 years old. (R. 209-17.) After her applications were denied initially and on reconsideration, the ALJ held a hearing on October 4, 2017. (R. 36.) On January 24, 2018, the ALJ issued an opinion denying Plaintiff's applications for benefits. (R. 12.) The Appeals Council denied her request for review of the ALJ's decision (R. 1-2), making the ALJ's

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On March 27, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 10.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 15.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

decision the final decision of the Commissioner. *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). Plaintiff has now moved to remand the ALJ's decision (D.E. 17), and the Commissioner has moved to affirm. (D.E. 28.)

## I. Administrative Record

Plaintiff lives at home with her two young children, born a year apart in June 2014 and June 2015, and their father. (R. 43.) She is considered obese based on her Body Mass Index. (R. 24.)

On November 12, 2015, Plaintiff was admitted to the hospital after presenting with right-side numbness and right lower extremity weakness. (R. 356.) A brain MRI was "highly suggestive" of multiple sclerosis ("MS"), with numerous white matter lesions (R. 381), while a cervical and lumbar spine MRI showed mild degenerative changes. (R. 383-84, 390.) Plaintiff was discharged on November 14 after receiving an intravenous steroid. (R. 354.) On November 19, she was admitted to the hospital again after presenting with worsening right-side numbness. (R. 356.) Plaintiff was given steroids and gabapentin (for nerve pain and seizures) for this "acute flare-up" of MS. (R. 362.) She displayed significant stress and anxiety coping with her diagnosis and was prescribed Cymbalta. (R. 362-64.) Plaintiff was discharged on November 23 in stable condition and set up with home physical therapy ("PT") and occupational therapy ("OT"). (R. 354.)

In December 2015, Plaintiff followed up with an internist at Advocate Medical Group ("Advocate"). She presented with numbness, tingling and diminished sensation over much of her body, and she appeared teary and extremely overwhelmed with her MS diagnosis. (R. 428, 440, 530.) Plaintiff also complained of shooting pains radiating down her right shoulder, although she had full motor strength in her extremities. (R. 428-30.) Her internist prescribed gabapentin for pain and fluoxetine for depression. (R. 430.)

On January 5, 2016, Plaintiff began treatment with neurologist Padmaja Gutti, M.D. On examination, Plaintiff's deep tendon reflexes were 3+ bilaterally,[4] and she had full range of motion in her extremities and full strength on her left side, but her right extremity strength was limited at 4/5.[5] (R. 502.) Plaintiff had no sensory deficits, but she reported having occasional numbness and tingling in her right foot and face. (*Id*.) Her balance was impaired, and she had weakness on her right side. (*Id*.) Plaintiff also reported experiencing shocking sensations in her body (Lhermitte's sign). (R. 500.) Dr. Gutti advised Plaintiff to start Plegridy, an injection used to treat relapsing forms of MS.[6] (R. 503.)

At a follow-up visit with her internist later that month, Plaintiff reported that her episodes of pain, numbness and tingling were debilitating for the few minutes they lasted, but resolved on their own and were relieved with a neck brace and PT. (R. 516.) Her right upper extremity weakness was improved. (R. 518.) The plan was for Plaintiff to start Plegridy, continue PT, continue gabapentin, apply capsaicin (a cream used to help relieve nerve pain),[7] start Flexeril (muscle relaxant) and continue fluoxetine. (R. 724-25.)

---

[4] Under the National Institute of Neurological Disorders and Stroke Muscle Stretch Reflex Scale, deep tendon reflexes are graded on a scale of 0 to 4, with plus or minus indicating the reflex is in between whole grades. Barret Zimmerman & John B. Hubbard, *Deep Tendon Reflexes* (last updated July 31, 2020), https://www.ncbi.nlm.nih.gov/books/NBK531502/.

     0 = no response; always abnormal
     1+ = a slight but definitely present response; may or may not be normal
     2+ = a brisk response; normal
     3+ = a very brisk response; may or may not be normal
     4+ = a tap elicits a repeating reflex (clonus); always abnormal[.] Whether the 1 + and 3 + responses
     are normal depends on what they were previously.

H. Kenneth Walker, Deep Tendon Reflexes. In *Clinical Methods: The History, Physical, and Laboratory Examinations*, ch. 72 (H.K. Walker et al. eds., 3rd ed. 1990), https://www.ncbi.nlm.nih.gov/books/NBK396/.

[5] Under the Medical Research Council Muscle Testing scale, a person's muscle strength is tested against the examiner's resistance and graded on a 0 to 5 scale, with 5 meaning muscle activation against the examiner's full resistance and 4 meaning muscle activation against some resistance. Usker Naqvi & Andrew l. Sherman, *Muscle Strength Grading*, (last updated Sept. 3, 2020), https://www.ncbi.nlm.nih.gov/books/NBK436008/.

[6] Plegridy "will not cure MS, but it may slow some of the disabling effects and decrease the number of relapses of the disease." https://www.mayoclinic.org/drugs-supplements/peginterferon-beta-1a-intramuscular-route-subcutaneous-route/description/drg-20113034.

[7] https://www.mayoclinic.org/drugs-supplements/capsaicin-topical-route/description/drg-20062561.

On February 1, 2016, Plaintiff underwent a state agency mental health consultative examination. She described her hands as "pretty numb," making it difficult to hold a knife, shampoo her hair and shave her legs. (R. 582.) Her mental status examination was unremarkable, and the examiner noted she could not rule out diagnoses of generalized anxiety disorder and obsessive-compulsive disorder ("OCD"). (R. 583.) Afterward, a non-examining state agency reviewer opined that Plaintiff did not have a severe mental impairment. (R. 79.)

On February 4, Plaintiff underwent a state agency internal medicine consultative examination. She reported having headaches and constant mild to moderate pain in her right hand, hips and low back, making it hard to sit or stand for prolonged periods; she took 600 mg of ibuprofen for her headaches and had not yet started taking Plegridy. (R. 585-86.) On examination, Plaintiff had normal speech and full reflexes, coordination, sensation and motor strength, but some difficulty with balance, tandem walking and getting up from a chair and on and off the examination table. (R. 586-87.) She would not demonstrate range of motion of her spine and limbs, stating: "I have pain and I may fall doing it." (R. 587.) Her gait was slow but normal; she used a walker for confidence but could stand without aid. (*Id*.) Plaintiff had no limitation in fine and gross movements in her hands and fingers. (R. 588.) Afterward, a non-examining state agency reviewer opined Plaintiff could perform the full range of light work (R. 81); however, on reconsideration in June 2016, another reviewer found she was limited to standing or walking for two hours, with no limits on sitting. (R. 94-95.)

On February 25, Plaintiff followed up with her neurologist; she reported minimal side effects after starting Plegridy but had continued Lhermitte's sign and a "cape-like" distribution of numbness and tingling (over her shoulders) several times a day lasting for a few minutes. (R. 599.) On examination, Plaintiff's right upper and lower extremity strength were 4/5, and her reflexes

were measured at 2+. (R. 601.) Plaintiff had no sensory or coordination deficits, but her gait was antalgic (altered to alleviate pain) on the right side. (*Id*.)

On April 27, 2016, Plaintiff complained of shooting pain in a cape-like distribution and back and hip pain; Tylenol and ibuprofen provided incomplete relief for the pain, so her doctor increased her dose of gabapentin. (R. 592-94.) The following week, Dr. Gutti's examination showed Plaintiff had 4/5 right extremity strength and 3+ deep tendon reflexes. (R. 645-56.) Her balance was impaired and she complained of migraines, but she had no sensory or coordination deficits. (*Id*.) Dr. Gutti opined that Plaintiff's MS was "stable on Plegridy." (R. 646.)

On June 11, Plaintiff underwent another state agency internal medicine examination. Plaintiff reported she could stand for 30 minutes at a time and had no significant difficulties sitting. (R. 670.) She could dress herself but needed assistance shopping. (*Id*.) On examination, Plaintiff's gait was guarded but non-antalgic with the use of a walker, and she could not balance on the right. (R. 671.) Her strength was 4/5 on the right and 5/5 on the left, and she had normal ability to grasp and manipulate objects. (*Id*.) Plaintiff had normal range of motion of shoulders, elbows, wrists, hips, knees, ankles and spine, and deep tendon reflexes were present, equal and symmetric. (*Id*.)

On August 1, Plaintiff sought treatment for low back and hip pain, which she reported began three years before with her first pregnancy. (R. 703, 707.) Her doctor started her on meloxicam (nonsteroidal anti-inflammatory drug for pain) and opined the pain was osteoarthritis. (R. 706, 777.) An X-ray of her hips found mild to moderate osteoarthritis. (R. 772-73.)

On August 23, Plaintiff followed up with neurology. Her MS was stable on Plegridy, but she had intermittent random symptoms of fatigue, arm numbness and right leg weakness. (R. 774.) Plaintiff reported that her headaches had worsened, although Tylenol helped if she took it right away; Dr. Gutti prescribed Excedrin Migraine. (*Id.*, R. 776.) Plaintiff also reported fatigue, which

may have been due to her MS or gabapentin; Dr. Gutti prescribed Modafinil, a stimulant used to treat excessive sleepiness. (R. 776.) Physical examination showed full strength on the left side and 4/5 on the right side with mild giveaway weakness. (*Id.*) Plaintiff's gait favored her right leg and showed a "slight imbalance." (*Id.*) Her reflexes were measured at 2+. (*Id.*)[8]

On November 22, 2016, Plaintiff followed up with Dr. Gutti, presenting with new complaints of decreased sensation in her fingertips and intermittent left upper extremity and neck pain. (R. 754.) Physical examination again showed slightly decreased strength on the right side, and Plaintiff's gait favored her right leg. (R. 755.) Dr. Gutti added a prescription for amantadine, which is used to control movement problems.[9] (*Id.*)

On February 28, 2017, Plaintiff complained to her internist of intermittent headaches not relieved with ibuprofen. (R. 750.) She reported having feelings of hopelessness, but she had stopped taking medication for depression. (*Id.*) On examination, Plaintiff had no sensory deficits and normal muscle strength and tone. (R. 752.) The doctor opined that her headaches may be a side effect of Plegridy. (R. 753.)

On April 23, Plaintiff was admitted to the hospital for one night with severe fatigue. (R. 834.) She was diagnosed with a urinary tract infection ("UTI") and given antibiotics. (*Id.*) The hospital physician opined her fatigue was caused by the UTI or her MS. (*Id.*) On examination, Plaintiff had normal coordination, speech, sensation and motor strength. (R. 856.) On May 22, Plaintiff followed up with neurology, complaining of fatigue, tingling and numbness. (R. 741.)

---

[8] Beginning in May 2016, Plaintiff also sought treatment for hidradenitis suppurativa (skin condition causing small, painful lumps to form under the skin when hair follicles in the skin become blocked) of her left armpit. (R. 711.) Her internist noted the condition was best treated with weight loss, changes in diet and careful hygiene, and prescribed an antibiotic. (R. 710, 714.) In September, she was prescribed Tramadol to alleviate her hidradenitis pain, and a physician opined that Plaintiff's skin condition was caused by a bacterial or fungal infection rather than hidradenitis, and recommended Plaintiff finish her course of antibiotics. (R. 692-95, 698, 757, 763, 765.) The ALJ found this impairment was not severe (R. 18), and Plaintiff does not contest that finding in her briefing.

[9] https://medlineplus.gov/druginfo/meds/a682064.html.

Physical examination showed "very mild right[-]side weakness" of 4+ to 5, full left-side strength, and her reflexes were measured between 1 and 2. (R. 742.) Plaintiff was able to walk without assistance but needed a cane for balance. (R. 742-43.) Her physician prescribed sumatriptan as needed for migraines, and she was to continue taking amantadine, gabapentin and Plegridy. (R. 743.) On June 5, 2017, a physical examination at Advocate showed Plaintiff had normal gait, full range of motion (including in fingers), and full muscle strength and tone. (R. 739.)

## II.     October 4, 2017 Evidentiary Hearing

Plaintiff testified that her children's father (who worked full-time) and his mother (who lived in the same apartment building) helped her with cooking and taking care of her children. (R. 43-45.) She testified that despite taking her medications, she sometimes had bad days where she just sat at home because her right side was weak, and she took daily two-hour naps with her children due to fatigue. (R. 48-50.) Plaintiff sometimes fumbled her phone due to numbness and washed her hair with gloves because her skin was very sensitive. (R. 46, 51-52.) She also testified that she has had depression since she was a child, but she did not receive counseling and stopped taking medication for it because of related weight gain. (R. 48-49, 53.)

An independent medical expert, Larry M. Kravitz, Psy.D., testified that the "only notable" symptom in any of Plaintiff's mental status examinations was mild disturbance in memory. (R. 55.) He opined that she had only mild restrictions in mental functioning except that "while the evidence is limited, [he] would give her a moderate restriction in being able to maintain concentration, pace or persistence because . . . the combination of her MS and the anxiety symptoms . . . certainly affects her functioning in time. . ." (R. 55-56.) Dr. Kravitz opined Plaintiff's residual functional capacity ("RFC") should be limited to "simple and low level detailed

tasks, one to three step tasks," and only "brief and uncomplicated interactions" at work with "routine predictable work stressors, no strict production expectations." (R. 56.)

The ALJ provided the vocational expert ("VE") with a hypothetical person who could perform sedentary work; occasionally balance, stoop, kneel and crouch; frequently reach bilaterally in all directions, including overhead; frequently handle, finger and feel with both extremities; and "perform simple, routine tasks requiring no more than short, simple instructions, simple work-related decision making with few workplace changes." (R. 60.) Although the hypothetical person could not perform Plaintiff's past relevant work as a beauty shop manager or administrative clerk, the VE testified that other jobs were available in significant numbers in the national economy provided the individual would be on task 85 percent of the workday. (R. 60-61.) The number of available jobs would not be reduced if the individual was further restricted to no fast-paced work, no conveyor-belt work, no strict production quotas and only occasional contact with the general public, supervisors and coworkers. (R. 61.) The VE testified that no jobs would be available if the person were limited to occasional handling, fingering and feeling because sedentary works requires at least frequent handling and fingering bilaterally. (R. 62.)

III.    **ALJ's Decision**

On January 24, 2018, the ALJ issued an opinion finding Plaintiff was not disabled within the meaning of the Social Security Act from her alleged onset date of November 11, 2015 through the date of the decision. (R. 16.) The ALJ determined Plaintiff had the severe impairments of MS, anxiety and obesity, but that her impairments, alone or in combination, did not meet or medically equal the severity of a Listing. (R. 18-19.) The ALJ found Plaintiff had only mild limitations in understanding, remembering or applying information; interacting with others; and adapting or managing oneself; and moderate limitations in concentrating, persisting or maintaining pace. (R.

19-20.) The ALJ gave moderate weight to the non-examining state agency opinion limiting Plaintiff to standing/walking two hours in an eight-hour workday (R. 24), and assigned Plaintiff an RFC to perform sedentary work with the ability to frequently reach in all directions, including overhead, with both upper extremities; frequently handle, finger and feel with both upper extremities; perform simple, routine tasks requiring no more than short, simple instructions and simple work-related decision making with few workplace changes; and perform work with no strict production quotas, no conveyor-belt work, and no fast-paced work. (R. 21-22.)

The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the other evidence in the record. (R. 22.) The ALJ reasoned that despite Plaintiff's complaints of numbness, tingling and pain due to MS, her physical examinations showed normal deep tendon reflexes, no loss of sensation, normal muscle strength and tone, "normal gait, full musculoskeletal range of motion; and the ability to grasp and manipulate objects normally." (R. 22, 26-27.) In addition, the ALJ found that the state agency consultative examinations supported the findings of Plaintiff's treatment providers. (R. 23.) The ALJ acknowledged that Plaintiff was hospitalized in April 2017 for fatigue, but noted that her fatigue was believed to be multifactorial, due to MS, medications and a UTI, and that after being prescribed medication, the record does not reflect ongoing treatment for fatigue. (R. 23-24.) Further, the ALJ noted that the most recent examination in the record, from June 2017, showed Plaintiff "had a normal gait, full range of motion in all finger joints, normal muscle tone and strength and no coordination or sensory deficits." (R. 23.) Because examinations showed Plaintiff had normal gait and full musculoskeletal range of motion, the ALJ found that Plaintiff's obesity did not limit her functioning beyond that provided in the RFC. (R. 24.)

In addition, the ALJ provided the following reasons for finding that the record failed to support Plaintiff's allegations as to the disabling nature of her symptoms:

(1) Plaintiff's daily activities were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. The ALJ noted Plaintiff "cares for her two small children (e.g., feeds them, dresses them); cares for her own personal hygiene (albeit with some physical difficulties); drives a car (not often); prepares simple meals (e.g., sandwiches, waffles); performs household chores (e.g. picks things up, dusts); shops in stores; and pays bills and manages bank accounts." The ALJ acknowledged Plaintiff reported getting "some assistance from her husband and his mother in caring for her children and performing household tasks," but found Plaintiff testified to "a fair degree of independence." (R. 26.)

(2) The results of Plaintiff's physical examinations were inconsistent with her statements regarding her degree of limitation. "In particular, while there were some references to the claimant having reduced strength, particularly in the right side, the record also included numerous references to the claimant's normal gait, full musculoskeletal range of motion, and her ability to grasp and manipulate objects normally." (*Id.*)

(3) "[T]he results of objective diagnostic tests and studies do not support the claimant's allegations," but instead showed her MS remained stable. (*Id.*)

(4) Plaintiff's "treatment has been conservative in nature, and including medications such as Gabapentin, Cyclobenzaprine [a muscle relaxant] and Plegridy," and she "reported relief from [the] prescribed treatment." (*Id.*)

(5) "[T]here is only limited evidence of the claimant's fatigue, and it appears that this was controlled with a prescription for amantadine and a reduction in her dosage of gabapentin." (*Id.*)

(6) "[T]he record does not contain an opinion from a treating or examining source physician indicating that the claimant is currently disabled," despite Plaintiff obtaining a disability form from her internist in February 2016. (*Id.*)

Regarding Plaintiff's mental health, the ALJ noted she was diagnosed with OCD and anxiety disorder when she was hospitalized for an MS flare up in November 2015, but that afterward, "the record does not reflect any ongoing mental health treatment, and the claimant acknowledged at hearing that she was no longer on psychotropic medications nor had she sought other mental health treatment since the alleged onset date." (R. 24.) The state agency psychological consultative examination did not show anything to the contrary, "only indicat[ing] she could not

rule out a generalized anxiety disorder or obsessive-compulsive disorder." (*Id.*) The ALJ gave little weight to the non-examining state agency psychological opinions and moderate weight to the ME's opinion, "as Dr. Kravitz's opinion appears more consistent with the totality of the evidence." (R. 25.) The ALJ agreed with Dr. Kravitz's mental RFC opinion, except the ALJ found a social limitation was inconsistent with Plaintiff's mild limitation in interacting with others and at odds with Plaintiff's statements that she got along with family, friends and neighbors. (*Id.*)

Ultimately, the ALJ found Plaintiff was not disabled because although she was unable to perform any past relevant work, jobs existed, according to the VE, in significant numbers in the national economy that she could perform. (R. 27-28.)

## IV.    Standard of Review

The Court's review asks whether the ALJ's decision was "supported by substantial evidence," a deferential standard meaning "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Arnold v. Saul*, 990 F.3d 1046, 1047 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019)). "We will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it. We review the ALJ's decision to determine whether it reflects an adequate logical bridge from the evidence to the conclusions." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) (internal citations omitted). "Even if reasonable minds could differ on the weight the ALJ gave to the medical evidence, we will not substitute our judgment for that of the ALJ's by reweighing the evidence." *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). For the reasons that follow, the Court finds that the ALJ's decision in this case was supported by substantial evidence.

## V. Physical RFC Finding

Plaintiff argues that the ALJ's physical RFC finding was not supported by substantial evidence because "[g]iven that the ALJ afforded (1) 'some' and 'moderate' weight to the opinion of State agency medical consultants, (2) the RFC significantly differed from the opinions of State agency medical consultants, and (3) [the ALJ] found the medical evidence not supportive of [Plaintiff's] testimony, the ALJ was left with [an] evidentiary deficit that she could not . . . fill with her lay medical opinion." (D.E. 18: Pl.'s Br. in Supp. Of Mot. at 3.) Defendant agrees the sedentary RFC assigned by the ALJ differs from the light RFC offered by the state agency consultants, but contends that there was no error because "the ALJ reasonably crafted an RFC based in part on the only medical opinions in the record, both of which found Plaintiff to be less limited than the ALJ concluded," and in part on Plaintiff's testimony. (D.E. 29: Def.'s Mem. at 8, 17.)

### A. The RFC Was Supported by Substantial Evidence

The ALJ bears "the 'final responsibility' for determining a claimant's residual functional capacity." *Fanta v. Saul*, -- F. App'x --, 2021 WL 961647, at *2 (7th Cir. Mar. 15, 2021) (quoting 20 C.F.R. § 404.1527(d)(2)). "'[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.'" *Whitehead v. Saul*, 841 F. App'x 976, 982-83 (7th Cir. 2020) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)). Instead, "[a]n ALJ adequately supports [her] RFC determination when [she] 'consider[s] all limitations supported by [the] record evidence' and 'tie[s] the record evidence to the limitations included in the RFC finding.'" *Vang v. Saul*, 805 F. App'x 398, 401-02 (7th Cir.), cert. denied sub nom. *Vang v. Saul*, 141 S. Ct. 409 (2020) (quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019)). This evidence includes the claimant's self-reported symptoms and testimony, to the extent the ALJ finds it credible. *Jozefyk*, 923 F.3d at 497.

Here, contrary to Plaintiff's claims, there was no evidentiary deficit, and the ALJ did not construct an RFC based on her own lay opinions; instead, the ALJ determined Plaintiff's RFC based on the evidence in the record, including medical evidence, diagnostic imaging, stage agency examinations and reports, and Plaintiff's own testimony and self-reports.[10] "The ALJ gave solid, substantiated reasons for giving more weight to the state-agency physicians' opinions than to [Plaintiff's] claims about the limiting nature of her symptoms." *Gedatus*, 994 F.3d at 905. "The ALJ described all the medical evidence she considered in deciding to reduce the state agency consultants' 'light' RFC to the sedentary level." *Montalto v. Berryhill*, No. 17 C 5976, 2019 WL 1405602, at *12 (N.D. Ill. Mar. 28, 2019). Indeed, the ALJ's RFC finding "was more limiting than that of any state agency doctor [], illustrating reasoned consideration given to the evidence [Plaintiff] presented." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

## B. Plaintiff's Burden to Prove Additional Limitations Warranted in the RFC

Nevertheless, Plaintiff asserts that because no medical expert opined she was limited to sedentary work, "the ALJ should have called a medical expert to provide an opinion based on all relevant evidence" or more specifically explained why she credited "particular functional restrictions" in Plaintiff's testimony while "simultaneously rejecting others." (Pl.'s Br. at 5.) The Court rejects both of these contentions. There was more than sufficient evidence in the record upon which the ALJ could base her RFC decision, and the ALJ adequately explained her decision to credit some, but not all, of Plaintiff's testimony in crafting the RFC.

It is Plaintiff, not the ALJ, who ultimately "bears the burden of proving that she is disabled" by "identifying any objective evidence in the record corroborating" her allegations, *Karr*, 989 F.3d

---

[10] *Suide v. Astrue*, the case on which Plaintiff's argument primarily relies, is distinguishable. In that case, unlike here, there *was* an evidentiary deficit left by the ALJ's rejection of a physician's reports because "[t]he rest of the record simply d[id] not support the parameters included in the ALJ's residual functional capacity determination." 371 F. App'x 684, 689-90 (7th Cir. 2010). Here, by contrast, the rest of the record adequately supports the RFC determination.

at 513, and "show[ing] how her medically determinable impairments caused any limitations beyond those the ALJ found." *Gedatus*, 994 F.3d at 905. "The ALJ determined that the record d[id] not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in [her] decision." *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). The ALJ was not required to obtain an additional medical opinion "because the record contained adequate information for the ALJ to render a decision." *Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018).

"A fundamental problem is [Plaintiff] offered no opinion from any doctor to set . . . any other limits, greater than those the ALJ set." *Gedatus*, 994 F.3d at 904-05. *See also Fanta*, 2021 WL 961647, at *3 (claimant failed to "point to any objective evidence or medical opinions in the record that support stricter limitations" than those set by the ALJ). If Plaintiff believed more evidence could show she had additional limitations, she "had the burden to supply that evidence to the ALJ." *Krug v. Saul*, 846 F. App'x 403, 406 (7th Cir. 2021). Although an ALJ has a duty to fully and fairly develop the record, "a represented claimant, like [Plaintiff], is presumed to have made h[er] best case before the ALJ." *Harris v. Saul*, 835 F. App'x 881, 885 (7th Cir. 2020) (internal quotations and citations omitted). As in *Krug* and *Harris*, Plaintiff's counsel affirmed at her hearing that the record was complete (*see* R. 39), and Plaintiff provides no reason "why the ALJ should have investigated further after receiving this assurance." *Krug*, 846 F. App'x at 406. "A claimant who does not 'identify medical evidence that would justify further restrictions' is not entitled to remand." *Sosh v. Saul*, 818 F. App'x 542, 546 (7th Cir. 2020) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)).

### 1. Manipulative Limitations

In particular, Plaintiff contends that the ALJ failed to "explain how any particular piece of evidence . . . supported work at the sedentary exertional level, as opposed to precluding all competitive work, or frequent gross and fine manipulative restrictions as opposed to occasional gross and fine manipulative restrictions." (Pl.'s Br. at 4-5.) But the ALJ did explain that there was no evidence in the medical record indicating Plaintiff had any manipulative restrictions, and the ALJ noted that as recently as June 2017, Plaintiff's physical examinations showed she had the ability to grasp and manipulate objects normally. (R. 22, 26-27.)

Moreover, "[t]he record contains scant objective evidence supporting [Plaintiff's] self-reported symptoms . . . that might prevent frequent hand use," and the ALJ adequately explained that Plaintiff's treating physicians "found no manipulative limitations. . . . Thus, the record lacked evidence of handling limitations, except for [Plaintiff's] testimony, which the ALJ reasonably found unreliable." *Zoch v. Saul*, 981 F.3d 597, 602-03 (7th Cir. 2020). *See also Deborah M.*, 994 F.3d at 791 (upholding ALJ decision not to include manipulative limitations in the claimant's RFC because the ALJ properly determined that despite the claimant's reported difficulties using her hands due to carpal tunnel syndrome, no doctor ever deemed it a manipulative limitation). The ALJ's decision as to Plaintiff's manipulative limitations was supported by substantial evidence.

### 2. Obesity and Degenerative Disc Disease

The ALJ relied on the record, which showed Plaintiff had normal gait and full musculoskeletal range of motion and strength, to find that Plaintiff's obesity did not limit her functioning beyond that provided in the RFC. (R. 24.) However, Plaintiff contends that "[c]onsidering that obesity and degenerative disc disease of the lumbar spine can make it the same if not more difficult to sit for extended periods as to stand," the ALJ did not adequately account

for how these impairments affected her ability to perform sedentary work. (Pl.'s Br. at 6.) Plaintiff is essentially arguing that the ALJ should have "speculate[d] on additional functional effects of obesity" and disc disease. *Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018). But "[i]t was [Plaintiff's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018). Here, "[i]t is unclear what kinds of work restrictions might address [Plaintiff's] limitations . . . because [s]he hypothesizes none." *Jozefyk*, 923 F.3d at 498.[11] Thus, Plaintiff's motion to remand on this issue is denied.

## VI.     Mental RFC Finding

Plaintiff also contests the ALJ's mental RFC finding. The ALJ limited Plaintiff to performing simple, routine tasks requiring no more than short, simple instructions and simple work-related decision making with few workplace changes; and performing work with no strict production quotas, no conveyor-belt work and no fast-paced work. (R. 21-22.) Plaintiff contends that this RFC finding was faulty because the ALJ gave moderate weight to Dr. Kravitz's opinion but failed to explain why she did not limit Plaintiff to "one- to three-step tasks" as Dr. Kravitz did, and the ALJ failed to adequately account for her moderate limitations in concentrating, persisting or maintaining pace in the RFC analysis. (Pl.'s Br. at 8-10.) The Court disagrees.

### A.     One- to Three-Step Tasks

Plaintiff's argument that the ALJ erred by not including a limitation to one- to three-step tasks is "'nothing more than a dislike of the ALJ's phraseology.'" *Vang*, 805 F. App'x at 402 (quoting *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)). Plaintiff contends that "it is unclear

---

[11] Plaintiff notes that an MRI of her lumbar spine showed degenerative disc disease (Pl.'s Br. at 7), but "the ALJ['s] fail[ure] to discuss an MRI that showed mild degenerative changes . . . was not reversible error because . . . [it] mattered little in light of the claimant's treating physicians' consistent description of her condition as mild or benign." *Deborah M.*, 994 F.3d at 788-89 (internal quotations and citations omitted).

whether [the VE's] proposed jobs could be performed by an individual limited to 1-3 step tasks" (Pl.'s Br. at 9-10), but as Defendant points out, the jobs that the ALJ determined were available to Plaintiff were reasoning level one positions, which only require carrying out "simple one-or two-step instructions," which would be included within the limitations set forth in Dr. Kravitz's opinion. (Def.'s Mem. at 14-15, citing Dictionary of Occupational Titles ("DOT") 669.687-014, 713.687-018, and Appendix C.) Moreover, the Seventh Circuit defines "complex" instructions as those "with more than two steps, or GED level two reasoning" and "simple" instructions as those "with at most two steps, or GED level one reasoning," *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021), which accords with the ALJ's mental RFC determination.

The Seventh Circuit's decision in *Surprise v. Saul*, 968 F.3d 658 (7th Cir. 2020), is on point. In *Surprise*, the appellate court upheld the ALJ's RFC formulation limiting the claimant to "perform[ing] routine, repetitive tasks and follow[ing] simple, non-complex instructions," despite the medical expert's testimony limiting the claimant to "direct, one or two steps or three steps that can be easily followed" because there was "no conflict, obvious or otherwise" – and the claimant had identified none – "between a one- to three-step instruction limitation" and the ALJ's RFC formulation. *Id.* at 662-63.[12] So, too, the ALJ's mental RFC finding in this case adequately accounts for the medical expert's testimony.

### B.    Concentrating, Persisting or Maintaining Pace

Nevertheless, Plaintiff contends that a limitation to work involving simple and routine instructions does not adequately account for moderate limitations in concentration, persistence or

---

[12] In fact, the Seventh Circuit noted that "at least one of our sister circuits has determined a discrepancy between a simple-tasks limitation and the DOT reasoning levels—like the one presented here—'is not the type of actual or apparent conflict that necessitates a resolution under SSR 00-4p' because a vocational expert and the DOT may use different terminology." *Surprise*, 968 F.3d at 662-63 (quoting *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 420 (6th Cir. 2014)).

pace. (Pl.'s Br. at 9-10.) It is true that "the ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks,'" *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); however, there is no "categorical rule to the effect that an ALJ may never accommodate 'moderate' limitations in concentration, persistence, and pace with only a restriction to simple instructions and tasks." *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021); *see also Pavlicek*, 994 F.3d at 783 ("a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace."). "Even generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) (quoting *Jozefyk*, 923 F.3d at 497-98).

The bottom line is that "the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace." *Crump* 932 F.3d at 570. Here, as Defendant points out, Dr. Kravitz is the only doctor who opined that Plaintiff had moderate limitations in concentrating, persisting or maintaining pace, and he opined Plaintiff could perform work with certain restrictions, which the ALJ accounted for in the RFC. (Def.'s Mem. at 16.) The ALJ was entitled to rely on the medical expert's opinion as the basis for her RFC assessment, which the ALJ found consistent with the sparse evidence of mental health limitations in the record. *Urbanek*, 796 F. App'x at 914. Thus, the Court finds that the RFC adequately accounted for moderate restrictions in Plaintiff's ability to concentrate, persist or maintain pace. *See Pavlicek*, 994 F.3d at 784 (holding that the RFC was supported by substantial evidence because it included the same restrictions that doctors stated

would accommodate the claimant's moderate limitations in concentrating, persisting or maintaining pace).

Moreover, "even if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [Plaintiff's] limitations in concentration, persistence, or pace because [s]he hypothesizes none," and she "cites no evidence that those deficits keep [her] from performing simple, routine, and repetitive tasks," so "there are no evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Jozefyk*, 923 F.3d at 498. *See also Lockett v. Saul*, 834 F. App'x 236, 239 (7th Cir. 2020) (affirming limitations in RFC where the claimant cited no evidence of a need for specific restrictions, and no doctor opined that he had restrictions beyond those the ALJ found); *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir. 2021) (upholding the ALJ's decision limiting the claimant to simple, routine and repetitive work with only simple changes where the claimant did not provide any other "credible medical evidence" indicating his symptoms required additional RFC restrictions to account for his limitations in concentrating, persisting or maintaining pace).

## VII.    Credibility

This Court defers to the ALJ's credibility determinations unless they are "patently wrong." *Zoch*, 981 F.3d at 601. The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the other evidence in the record, including examinations by Plaintiff's treatment providers, state agency consultative examinations which supported the findings of her treatment providers, and diagnostic tests and studies. (R. 22-23, 26-27.) Plaintiff contends that the ALJ's credibility determination was faulty for several reasons, each of which the Court rejects below.

## A. Credibility Standard

First, contrary to Plaintiff's arguments, the ALJ's use of the boilerplate phrase "not entirely consistent" to describe Plaintiff's credibility did not improperly increase Plaintiff's burden of proof (Pl.'s Br. at 10-11),[13] because the ALJ did not rest on this boilerplate language, but properly explained her reasoning, "set[ting] forth specific reasons for discounting [Plaintiff's] subjective reports of symptoms." *Gedatus*, 994 F.3d at 900.

Moreover, it is not error for an ALJ to credit, partially, Plaintiff's testimony by "us[ing] what he heard from [Plaintiff] . . . to tailor an RFC that fit her limitations, though not necessarily the intensity to which she testified." *Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019). *See also Gedatus*, 994 F.3d at 901 (upholding ALJ determination that "sided with [the claimant] to a degree by determining she had severe impairments and needed some limitations"); *Jozefyk*, 923 F.3d at 497 (upholding the ALJ's partial credibility finding where the ALJ discounted some of the claimant's self-reported limitations that were not corroborated by doctors' observations and credited other portions of the claimant's testimony by including certain accommodations in the RFC). Here, the ALJ provided multiple adequate reasons for discounting portions of Plaintiff's testimony and self-reports and crediting others.

## B. ADLs

Second, Plaintiff contends that the ALJ failed to explain how her ADLs were inconsistent with her other statements and the medical evidence or how they demonstrated an ability to sustain full-time work, in light of her limitations in performing these tasks and her self-reported two-hour daily nap. (Pl.'s Br. at 11-12.) The ALJ found that Plaintiff's daily activities – including caring for

---

[13] This Court and others in this district have consistently rejected the argument that using the boilerplate language changes the Plaintiff's burden of proof, and Plaintiff has given us no reason to challenge the reasoning in those cases. *See*, *e.g.*, *Carmy M. v. Saul*, No. 19 C 4032, 2020 WL 5439982, at *3 (N.D. Ill. Sept. 10, 2020); *Deathra P. v. Saul*, No. 18 C 5882, 2020 WL 553705, at *7 n.12 (N.D. Ill. Feb. 4, 2020) (collecting cases).

her small children and performing household tasks (with "some assistance from her husband and his mother"), caring for her personal hygiene (with "some physical difficulties"), and shopping in stores – "were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" and Plaintiff's testimony to "a fair degree of independence." (R. 26.)

Although "a claimant's ability to perform daily activities does not necessarily translate into an ability to work full time . . . the ALJ correctly looked at Plaintiff's daily activities to see if they corroborated her [] claims, and she found that they did not." *Deborah M.*, 994 F.3d at 791 (holding that the ALJ's failure to mention a few limitations on some of the claimant's activities was not patently wrong). As explained above, the ALJ's opinion did not ignore Plaintiff's reported limitations in performing her daily tasks, but properly "considered the evidence of [her] daily activities in balance with the rest of her record," including her medical examination records, treatment history and diagnostic testing. *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020). "This is hardly equating the activities with the ability to work full time. And, in any case, . . . any possible error was harmless" because Plaintiff's ADLs were "only one of many factors in assessing [her] RFC." *Kuykendoll v. Saul*, 801 F. App'x 433, 439 (7th Cir. 2020).

Moreover, "[t]he RFC does not mention that [Plaintiff] naps for two hours every day, but this requirement is not supported by evidence other than her testimony, which the ALJ did not credit." *Green*, 781 F. App'x at 528. The ALJ reasoned that there was "only limited evidence of [Plaintiff's] fatigue, and it appears that this was controlled with a prescription for amantadine and a reduction in her dosage of gabapentin." (R. 26.) In addition, the ALJ acknowledged that Plaintiff was hospitalized due to fatigue but noted that the fatigue was due to a UTI as well as possibly Plaintiff's MS and medication, and Plaintiff was discharged after receiving medication. (R. 23-24.) And, if fatigue was a side effect of her medications, Plaintiff never "explain[ed] how, if at all,

[it] impacted her ability to work;" thus, "any conclusion about how [it] impacted her ability to work would be pure speculation." *Arnold*, 990 F.3d at 1047-48.

### C.    Inconsistency with Objective Evidence

Third, Plaintiff contends that the ALJ's decision was patently wrong because it focused on "normal" medical findings and overlooked evidence favorable to her claim. (Pl.'s Br. at 12-13.) The ALJ found that the results of Plaintiff's physical examinations and objective diagnostic tests and studies were inconsistent with her statements regarding her degree of limitation, and the record did not contain an opinion from a treating or examining source concluding otherwise. (R. 26.)

Contrary to Plaintiff's arguments, the ALJ adequately considered the evidence in the record favorable to her, including evidence that she had reduced strength on her right side and numbness, tingling and pain due to MS, but the ALJ found that physical examinations – including the most recent one in the record from June 2017 – predominantly showed normal deep tendon reflexes, no loss of sensation, normal muscle strength and tone, normal gait, full musculoskeletal range of motion; and normal ability to grasp and manipulate objects. (R. 26-27.) The ALJ "considered and narrated [Plaintiff's] medical past at length, as well as her testimony and the state-agency physicians' opinions." *Gedatus*, 994 F.3d at 900.

Plaintiff suggests that the ALJ misunderstood the nature of MS by relying on the fact that it was "radiographically stable." (Pl. Br. at 12-13.) But the ALJ did not rely only on the results of the radiographic testing to determine Plaintiff's functional limitations from MS; the ALJ corroborated her determination with the rest of the evidence in the record, as explained above. "[T]he presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence." *Gedatus*, 994 F.3d at 903.

**D.    Conservative Treatment and Improvement**

Fourth, Plaintiff contends that describing her treatment as "conservative" was "factually incorrect," and that the ALJ did not adequately identify her "supposed improvement" or explain how it enabled her to sustain full-time employment. (Pl.'s Br. at 13-14.) The ALJ found Plaintiff's statements regarding the degree of her limitations were inconsistent with the record because her "treatment has been conservative in nature, and including medications such as Gabapentin, Cyclobenzaprine and Plegridy," and she "reported relief from [the] prescribed treatment." (R. 26.)

This issue presents a closer question than the ALJ's other reasons for discounting Plaintiff's credibility. It is difficult to categorize Plaintiff's treatment as "conservative" where there is no evidence that her medical providers recommended additional treatment, and despite evident marked improvement in Plaintiff's condition once she started taking Plegridy, she did not consistently report complete relief from one doctor's appointment to the next. Nevertheless, any error in categorizing Plaintiff's treatment as conservative was harmless because the ALJ's partially adverse credibility finding was supported by the multiple other reasons described above, which constitute substantial evidence. *See Matthews v. Saul*, 833 F. App'x 432, 438 (7th Cir. 2020) (holding that the ALJ's partially adverse credibility finding was not patently wrong because substantial evidence in the record supported the ALJ's conclusion that the claimant's complaints were not entirely consistent with the record.) *See also Deborah M.*, 994 F.3d at 790 (holding that any error in the ALJ's consideration of the claimant's conservative, or lack of, treatment was harmless).

## **CONCLUSION**

For the foregoing reasons, the Court denies Plaintiff's motion for remand (D.E. 17) and grants the Commissioner's motion to affirm. (D.E. 28.) The case is terminated.

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: July 7, 2021**